333 Conn. 769 NOVEMBER, 2019 769

Cenatiempo *v.* Bank of America, N.A.

CARMINE CENATIEMPO ET AL. *v.* BANK
OF AMERICA, N.A.
(SC 20150)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.

*Syllabus*

The plaintiffs, who had defaulted on a residential mortgage for which the
defendant financial institution was the loan servicer, sought to recover
damages for the defendant's alleged violation of the Connecticut Unfair
Trade Practices Act (CUTPA) (§ 42-110a et seq.) and for negligence in
connection with conduct that had occurred during postdefault negotia-
tions. After the plaintiffs defaulted on their mortgage, the defendant
instituted a foreclosure action. In an effort to avoid foreclosure, the
plaintiffs made repeated, unsuccessful attempts, over the course of two
and one-half years, to obtain a loan modification from the defendant
pursuant to a federal loan modification program known as HAMP. The
defendant then withdrew the foreclosure action without explanation.
The plaintiffs continued to seek a loan modification, but the defendant
instituted a second foreclosure action. The defendant continued to mis-
handle the loan modification process for approximately three additional
years before it finally provided the plaintiffs with a permanent loan
modification. The terms of the modification increased the principal
amount that the plaintiffs owed by including attorney's fees for media-
tion, default fees, fees for commencing the second foreclosure action,
and accrued interest in excess of what the plaintiffs would have paid
if their initial loan modification application had been timely and properly
evaluated. The plaintiffs alleged in count one of their complaint that,
during the course of seeking a loan modification, the defendant commit-
ted unfair or deceptive acts in the conduct of trade or commerce with
the intent of preventing them from receiving a loan modification in that
the defendant failed to exercise reasonable diligence in reviewing and
processing completed loan modification applications, repeatedly
requested duplicative and unnecessary updates to financial information,
erroneously denied applications on the basis of purported failures to
provide requested documentation, misrepresented the status of the
plaintiffs' loan modification applications, erroneously denied applica-
tions on the basis of investor restrictions that did not apply, and repeat-
edly changed the personnel responsible for communicating with the
plaintiffs. The plaintiffs also alleged that the defendant had failed to
engage productively in approximately eighteen mediation sessions con-
ducted pursuant to Connecticut's foreclosure mediation program. The
plaintiffs claimed that the defendant's conduct offended the public policy
reflected in HAMP, the federal Real Estate Settlement Procedures Act
of 1974 (RESPA) (12 U.S.C. § 2601 et seq. [2012]), a 2011 consent order

Cenatiempo *v.* Bank of America, N.A.

that the defendant had entered into with the Office of the Comptroller of the Currency, a national mortgage settlement to which the defendant was a party, and this state's foreclosure mediation statutes (§§ 49-31k through 49-31o), and caused them to suffer substantial financial and emotional injuries. In addition, the plaintiffs claimed that the defendant had a corporate culture of intentional conduct designed to prevent mortgagors from receiving HAMP modifications. With respect to the negligence count of the complaint, the plaintiffs asserted that the defendant owed them a duty of care arising out of the servicing standards imposed by the same federal and state statutes, consent order and mortgage settlement agreement, and that the defendant breached that duty. The defendant moved to strike both counts of the complaint, claiming, inter alia, that the allegations pertaining to the manner in which a lender or loan servicer reviews a loan modification application are insufficient to state a cognizable CUTPA claim and that no duty of care exists between a lender or loan servicer and a borrower to support a negligence claim. The trial court granted the motion to strike the complaint, reasoning that the alleged conduct focuses on negotiation of relief from existing contractual obligations and that the parties are adversarial given the pendency of the foreclosure action. The trial court further reasoned that allowing such actions could discourage mortgage companies from negotiating loan modifications, lead to increased litigation, and subject mortgage companies to liability, even in the absence of material misrepresentation or malfeasance. The trial court finally noted that other remedies, such as sanctions for misconduct during the course of mediation, were available. On appeal from the trial court's judgment in the defendant's favor, *held*:

1. The plaintiffs' allegations having been sufficient to support a claim under CUTPA, this court reversed the judgment of the trial court insofar as that court struck the plaintiffs' CUTPA claim: the defendant's conduct in connection with its loan modification activities occurred in the conduct of trade or commerce; moreover, the plaintiffs' allegations included conduct and actions by the defendant that involved a conscious, systematic departure from known, standard business norms, and described practices that fell within the penumbra of some established concept of unfairness, as the alleged conduct was contrary to the public policies embodied in HAMP, RESPA, the consent order, the national mortgage settlement, and this state's foreclosure mediation statutes; furthermore, the defendant's allegedly improper practices, if proven at trial, could be found to be immoral, unethical, oppressive or unscrupulous and the cause of substantial injury to the plaintiffs, an injury that was not one that the plaintiffs or other consumers could have reasonably avoided and that was not outweighed by any countervailing benefits to loan servicers in escaping liability for such actions or to consumers or competition.

2. This court concluded that the defendant did not owe a common-law duty of care to the plaintiffs, and, accordingly, the trial court properly granted the defendant's motion to strike the plaintiffs' negligence count of the

Cenatiempo *v.* Bank of America, N.A.

complaint: assessing the relationship between the plaintiffs and the defendant under the totality of the circumstances, this court determined that, although the defendant should reasonably have been expected to review loan modification applications in a timely and accurate manner and to follow the loan servicing industry standards and rules regarding the loan modification process imposed by federal and state statutes, the consent order, and the national mortgage settlement, the law does not impose a duty on lenders to use reasonable care in commercial transactions with borrowers because the relationship between lenders and borrowers is contractual and loan transactions are conducted at arm's length, and to impose a duty of care on loan servicers, such as the defendant, could inhibit participation in the loan modification process, increase litigation, and have far-reaching consequences that extend beyond anything implicated under CUTPA; moreover, the consent order and the national mortgage settlement, to which the defendant was a party, did not create a special relationship between lenders and borrowers that would give rise to a legal duty, the plaintiffs, as incidental third-party beneficiaries of that order and settlement, did not have standing to sue to protect the benefits that the order and settlement confer, loan servicers already are subject to liability for violations of RESPA's implementing regulations and civil penalties for violations of the national mortgage settlement, making it unlikely that imposing a new duty on loan servicers would provide them with further incentive to carry out their review of loan modification applications with more due care, and numerous jurisdictions have concluded that neither the provisions of HAMP nor the relationship between a borrower and a lender or a loan servicer result in the imposition of any duty of care in the present context; furthermore, this court declined to consider the plaintiffs' claim that their negligence count could be construed to extend to a theory of negligence per se on the basis of the allegations in their complaint that the defendant breached a duty imposed by federal regulations and state statutes and that such breach caused their injuries, the plaintiffs having failed to raise this claim distinctly before the trial court, as they did not specifically allege negligence per se in their complaint, did not identify the particular legal provisions that the defendant allegedly violated or that established the standard of care, did not seek an articulation from the trial court, and did not mention such a theory in their motion to reargue.

Argued November 9, 2018—officially released November 26, 2019

*Procedural History*

Action to recover damages for, inter alia, the defendant's alleged violation of the Connecticut Unfair Trade Practices Act, and for other relief, brought to the Superior Court in the judicial district of Stamford-Norwalk, where the court, *Povodator*, *J.*, granted the defendant's

772 NOVEMBER, 2019 333 Conn. 769

Cenatiempo *v.* Bank of America, N.A.

motion to strike and rendered judgment thereon, from which the plaintiffs appealed. *Reversed in part*; *further proceedings*.

*Jeffrey Gentes*, with whom, on the brief, was *David Lavery*, for the appellants (plaintiffs).

*Pierre-Yves Kolakowski*, with whom was *Zachary Bennett Grendi*, for the appellee (defendant).

*Opinion*

McDONALD, J. This appeal requires us to determine whether allegations that a residential loan servicer engaged in systematic misrepresentations, delays and evasiveness over several years of postdefault loan modification negotiations with the mortgagors can suffice to state a claim for a violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq., and a claim for negligence. The plaintiffs, mortgagors Sandra Cenatiempo and Carmine Cenatiempo, appeal from the judgment of the trial court, which granted the motion of the defendant loan servicer, Bank of America, N.A.,[1] to strike the plaintiffs' complaint. The plaintiffs' principal contention is that their allegations were legally sufficient to support their CUTPA and negligence claims because the defendant's pattern of misconduct violated clearly defined standards and policies reflected in Connecticut, federal, and national statutory and regulatory requirements[2] aimed at preventing foreclosure that were binding on the

_____

[1] At the time of the plaintiffs' default, their loan was serviced by Wilshire Credit Corporation, a predecessor of the defendant. Wilshire merged with and into BAC Home Loans Servicing, LP (BACHLS), effective March 1, 2010, and the defendant is the successor to BACHLS as a result of a July 1, 2011 de jure merger with BACHLS. Because the defendant does not contest that it assumed BACHLS' liabilities as a matter of law, we reference all of the conduct alleged to be that of the defendant.

[2] The plaintiffs claim that federal and national statutory and regulatory requirements and this state's foreclosure mediation statutes form a comprehensive policy framework that supports the imposition of liability under CUTPA and a claim for negligence. We refer to these requirements as federal and national because certain of the requirements are federal statutes and policies, whereas the national mortgage settlement was a joint settlement

333 Conn. 769 NOVEMBER, 2019 773

Cenatiempo *v.* Bank of America, N.A.

defendant and that this conduct caused them substantial financial and emotional injury. We agree with the plaintiffs that the alleged facts could support a claim under CUTPA. We disagree with the plaintiffs, however, that the alleged facts would support a claim of negligence. Accordingly, we reverse the judgment of the trial court insofar as it struck the CUTPA claim.

I

The plaintiffs' thirty-nine page complaint includes 179 paragraphs of allegations relating to the defendant's conduct, spanning approximately five years. Because much of the alleged conduct repeats throughout this time period, we recite the plaintiffs' factual allegations in a summary fashion and provide specific allegations where necessary as part of our analysis. We construe those facts in the manner most favorable to sustaining the legal sufficiency of the complaint. See, e.g., *Bohan* v. *Last*, 236 Conn. 670, 674, 674 A.2d 839 (1996).

In April, 2003, Carmine Cenatiempo executed a promissory note in exchange for a loan in the original principal amount of $550,000 secured by a mortgage, given by both plaintiffs, on property located in Weston. The plaintiffs began experiencing financial hardship in 2008 and, subsequently, were declared in default on their mortgage by the defendant. In October, 2009, the defendant, as the servicer[3] of the loan, instituted a foreclosure

between the United States and the attorneys general of forty-nine states and the District of Columbia and several loan servicers. These statutes and agreements will be discussed in greater detail in part II of this opinion.

[3] "A servicer is neither a lender nor investor but is often a third-party financial institution that is hired by investors to manage and account for the loan. In other words, a servicer is tasked with interacting with borrowers and collecting and managing the borrower's monthly mortgage payments. Servicers primarily profit from a monthly servicing fee, which is a fixed percentage of the outstanding principal balance, but when a loan becomes delinquent, the amount and nature of servicing changes. . . . [I]t is the servicer that decides whether to foreclose or modify a loan. In some cases, a servicer can make a greater profit from initiating foreclosure than from granting a permanent loan modification." (Footnotes omitted.) A. Sarapinian, "Fighting Foreclosure: Using Contract Law To Enforce the Home Affordable Modification Program (HAMP)," 64 Hastings L.J. 905, 913 (2013).

Cenatiempo *v.* Bank of America, N.A.

action. The next two and one-half years were marked by the plaintiffs' repeated attempts to obtain a loan modification from the defendant under a federal program, discussed in part II of this opinion, known as HAMP—Home Affordable Modification Program. In response to the plaintiffs' efforts, the defendant failed to timely review completed applications, repeatedly requested updated and new financial information, erroneously denied applications based on purported failures to provide that requested documentation, erroneously denied applications based on investor restrictions that did not apply, and engaged in flawed evaluations of the applications. Concurrent with this pattern of conduct, the defendant failed to engage productively in the approximately eighteen mediation sessions conducted pursuant to the state's foreclosure mediation program.

The defendant's treatment of one such application is emblematic of the way it handled many of the plaintiffs' applications. In response to an April 17, 2010 letter from the defendant soliciting the plaintiffs for a HAMP modification, the plaintiffs submitted a modification application. Two weeks later, the defendant notified the plaintiffs that it did not have all of the documents it needed to review the application but did not explain what was missing. Rather, it listed all of the documents required for a HAMP application and gave the plaintiffs thirty days to respond. The plaintiffs sent additional documents, and the defendant confirmed receipt in August, 2010, and noted that its review could take forty-five days. Rather than undertaking its review, however, the defendant again requested additional documentation, which the plaintiffs provided. Thereafter, at the mediation session held for the purpose of discussing if the plaintiffs qualified for the HAMP modification in light of the submissions, the defendant for the first time claimed that the investor actually holding the loan did not allow modifications. At the plaintiffs' request, the

Cenatiempo *v.* Bank of America, N.A.

defendant asked the investor about the purported restriction, and the investor indicated that no such restriction existed. Nevertheless, the defendant refused to substantively review the modification application, again returning to the familiar request for a new application. The plaintiffs submitted numerous applications during this period with similar results. Then, in February, 2012, the defendant withdrew the foreclosure action without explanation or apparent reason.

Despite withdrawing the action, the defendant remained unresponsive to the plaintiffs' continued efforts to obtain a loan modification. The defendant provided evasive or opaque answers to the plaintiffs' inquiries about the status of their modification applications, failed to return the plaintiffs' repeated phone calls or to follow up with the plaintiffs as promised. Moreover, when the plaintiffs were able to speak with the designated representatives, they provided inconsistent information concerning the plaintiffs' eligibility for a "settlement" and denied their applications without explanation.

In October, 2012, the defendant instituted a second foreclosure action. Following the plaintiffs' election to once again participate in the state's mediation program, the parties engaged in mediation. For the next three years, including while the parties were purportedly engaged in mediation, the defendant continued to mishandle the loan modification process in a fashion similarly characterized by delay, repeated requests for documents previously provided, opaque denials, and a general evasiveness and nonresponsiveness.

In 2015, the defendant finally provided the plaintiffs with a trial period modification plan under HAMP, which became a permanent loan modification when that period was successfully completed. The terms of the permanent modification, however, increased the principal owed by including the defendant's attorney's fees for mediation sessions, default fees, fees for com-

mencing the second foreclosure action, and accrued interest in excess of what the plaintiffs would have paid if their initial loan modification application had been timely and properly evaluated.

Over the course of this five year odyssey leading to the permanent loan modification, the plaintiffs submitted at least nine separate workout applications. Several applications never resulted in decisions by the defendant, and some applications were pending before the defendant for hundreds of days—specifically, 263 days, 110 days, and 333 days. During the review process of one application, the defendant ignored thirteen of the plaintiffs' phone calls. Two applications were denied based on erroneous claims of investor restrictions, and one was also denied based on an incorrect net present value calculation for the property.[4] These two applications were pending before the defendant for a combined 352 days. Two other applications were denied based on a feigned lack of documentation after thirty-seven and sixteen days. While one application was pending, the plaintiffs provided updated documentation seven times, and the defendant refused to speak with the plaintiffs' counsel and discouraged participation in mediation.

In June, 2016, the plaintiffs commenced the present action against the defendant, alleging, in count one,

_____

[4] "A borrower who requests a loan modification under HAMP is entitled to a net present value calculation—that is, a determination of whether modifying the loan is worth more to the lender than proceeding to foreclosure. If modification is worth more, the [net present value] is positive and the lender is required to modify the loan, but if foreclosure is worth more, the [net present value] is negative and the lender may decline to modify." *Neil* v. *Wells Fargo Bank, N.A.*, 686 Fed. Appx. 213, 215 n.3 (4th Cir. 2017). The defendant initially estimated the net present value of the plaintiffs' property at $677,467. The plaintiffs' appraiser valued it at $585,000. Thereafter, the defendant ordered its own appraisal and concluded it was worth even less than the plaintiffs claimed, valuing it at $525,000. The defendant refused to change its analysis to reflect the accurate valuation.

Cenatiempo *v.* Bank of America, N.A.

violations of CUTPA and, in count two, negligence. In count one, the plaintiffs alleged that the defendant committed unfair or deceptive acts in the conduct of trade or commerce by failing to exercise reasonable diligence in reviewing and processing the plaintiffs' loan modification applications, repeatedly requesting duplicative, unnecessary updates to documentation, causing an undue delay of at least four years in offering the plaintiffs a trial and permanent loan modification, repeatedly changing the personnel responsible for communicating with the plaintiffs, repeatedly sending the plaintiffs vague, confusing and contradictory letters, misrepresenting the applicability of investor restrictions, misrepresenting its ability to proceed with conducting a foreclosure sale, misrepresenting the status of the plaintiffs' loan modification applications, and discouraging the plaintiffs from participating in foreclosure mediation. The plaintiffs alleged that this conduct offended the public policy reflected in HAMP, the federal Real Estate Settlement Procedures Act of 1974 (RESPA); see 12 U.S.C. § 2601 et seq. (2012); a 2011 federal consent order; see *In re Bank of America*, *N.A.*, *Charlotte*, *NC*, Enforcement Action No. 2011-48, Docket No. AA-EC-11-12, 2011 WL 6941540 (OCC April 13, 2011) (consent order between federal Office of the Comptroller of the Currency and Bank of America, N.A., Charlotte, NC); a national mortgage settlement to which the defendant was a party; *United States* v. *Bank of America Corp.*, United States District Court, Docket No. 1:12-cv-00361 (RMC) (D.D.C. April 4, 2012); and this state's foreclosure mediation statutes. See General Statutes §§ 49-31k through 49-31o. The plaintiffs further alleged that the defendant's conduct caused them substantial injury because it led to a considerably higher principal balance resulting in a higher monthly payment and a lost opportunity to earn $5000 in borrower incentive payments under HAMP, which severely impacted their emotional and financial well-being. The plaintiffs alleged that they

reasonably could not have avoided these injuries because they were in a "relatively powerless bargaining position," their refusal to comply with the defendant's demands would have put them "at grave risk of losing their home," and the injuries caused to homeowners, like the plaintiffs, are not outweighed by any countervailing benefits. The plaintiffs also alleged that the defendant profited from the plaintiffs' financial injury through increased interest rates, default fees and attorney's fees, and that its conduct in failing to adequately train its employees about loss mitigation and in failing to provide sufficient staff to handle modifications in a timely and ethical manner saved it money and increased its profits.

The plaintiffs also alleged that the defendant's improper conduct extended beyond their case. Specifically, they alleged that the defendant had a corporate culture of intentional conduct designed to prevent homeowners from receiving HAMP modifications. Such common conduct included requiring customers to return documents on short notice and then waiting months before reviewing such documents, training employees to falsely tell homeowners that it had not received their documents, allowing employees to remove documents from homeowners' files in order to make the accounts appear ineligible for modification, training employees to perform a " 'blitz' " twice a month, during which the defendant would order case managers and underwriters to deny any HAMP applications in which the financial documents were more than sixty days old, and failing to adequately train and staff the departments responsible for processing HAMP modifications.[5]

---

[5] These allegations are based on affidavits from employees of the defendant and its controlled subsidiaries taken in connection with a motion for class certification in an action filed in federal court against the defendant. See *Sheely* v. *Bank of America, N.A.*, 36 F. Supp. 3d 1364, 1372 (2014); see also *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, Docket No. M.D.L. 102193 (RWZ), 2013 WL 4759649 (D. Mass. September 4, 2013).

Cenatiempo *v.* Bank of America, N.A.

The second count of the complaint, sounding in negligence, alleged that the defendant owed the plaintiffs a duty of care arising out of servicing standards imposed by RESPA, the 2011 federal consent order, the national mortgage settlement, and the Connecticut foreclosure mediation statutes.[6] The plaintiffs further alleged that the defendant breached its duty based on the foregoing conduct, which caused the plaintiffs to suffer significant financial and emotional injury.

The defendant moved to strike both counts of the complaint. It asserted that the allegations pertaining to the manner in which a lender reviews a loan modification application are insufficient to state a cognizable CUTPA claim and that no duty of care exists between a lender and a borrower, including in processing mortgage loan modifications, to support a negligence claim. The defendant also moved to strike the complaint on the grounds that the plaintiffs lacked standing to enforce alleged violations of agreements to which they are not parties or third-party beneficiaries, and that their claims are improperly based on settlement negotiations.

The trial court granted the defendant's motion to strike. The trial court reasoned that the conduct in question "focuses on negotiation of relief from existing contractual obligations, a situation that the plaintiffs concede does not require any specific outcome, and in which the parties are adversarial given the pendency of litigation. . . . The court does not believe it to be appropriate or productive to adopt a requirement of 'just right' pacing of foreclosure mediation and negotiations, where too fast or too slow (including inefficiency

---

[6] The plaintiffs also alleged that the defendant "assumed a duty to diligently review [their] loan modification applications when it solicited and invited them to apply for such assistance." The plaintiffs' brief does not address a theory of assumed duty, and, thus, we deem any argument based on this allegation to be waived. Cf. *MacDermid, Inc.* v. *Leonetti*, 328 Conn. 726, 748, 183 A.3d 611 (2018) ("[a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly" [internal quotation marks omitted]).

Cenatiempo *v.* Bank of America, N.A.

and perhaps some level of incompetence) might result in negligence or CUTPA based liability.'' The trial court also expressed the concern that allowing such actions could discourage mortgage companies from negotiating loan workouts, lead to increased litigation, and subject mortgage companies to liability, even in the absence of material misrepresentations or malfeasance.[7] Finally, the court noted the availability of other remedies, namely, court imposed sanctions for misconduct during the course of mediation under General Statutes § 49-31n (c) (2). The trial court ultimately held that, ''based on the available authorities and policy considerations, the court can only conclude that, however sympathetic the plaintiffs' situation may be, it cannot support the negligence and CUTPA claims articulated in the plaintiffs' operative complaint.''

The plaintiffs filed a motion to reargue and reconsider. They claimed, among other things, that there are already fixed timetables for servicer decision making, that public policy regarding loan modifications favors the plaintiffs' cause of action, and that sanctions are imposed too rarely to be an effective remedy or deterrent. The trial court granted reconsideration but denied the plaintiffs any relief. The trial court subsequently rendered judgment for the defendant on the plaintiffs' claims. The plaintiffs appealed from the trial court's judgment to the Appellate Court, and, pursuant to General Statutes § 51-199 (c) and Practice Book § 65-2, we transferred the appeal to this court.

The essence of the plaintiffs' argument on appeal is that the trial court improperly struck their complaint ''largely because [the trial court] reached the wrong conclusions with respect to the public policy implications of allowing them to proceed.'' It is the plaintiffs'

_____

[7] Although not raised in the defendant's pleadings, the trial court injected a concern that allowing such actions could interfere with a mortgage servicer's relationship with the loan investor. The defendant similarly does not advance that argument to this court, and, consequently, we decline to address it.

Cenatiempo *v.* Bank of America, N.A.

position that HAMP, RESPA, the 2011 federal consent order, the national mortgage settlement, and this state's foreclosure mediation statutes form a comprehensive policy framework that supports the imposition of liability under CUTPA and under a negligence claim. More specifically, the plaintiffs contend that the foregoing programs and policies prescribe the defendant's obligations, including the speed and accuracy with which mortgage servicers must evaluate customer loan workout applications. The defendant's conduct in contravention of those obligations, the plaintiffs contend, was immoral, unethical, oppressive, and unscrupulous, and, as such, violated CUTPA. Additionally, the plaintiffs assert that the totality of the circumstances weigh in favor of allowing them to proceed on their negligence claim. Finally, the plaintiffs assert that the trial court did not consider the negligence per se aspects of their negligence claim and contend that the negligence count also should not have been stricken on the basis of that theory.

We reverse the judgment of the trial court insofar as it granted the defendant's motion to strike the CUTPA count but affirm insofar as it struck the negligence count of the complaint.

II

Because the plaintiffs' appeal rests largely on the requirements of various federal, national, and state obligations and the policies that undergird them, it is useful to begin with an overview of these obligations, all of which were imposed in response to a national foreclosure crisis prompted by the Great Recession.[8]

---

[8] "The Great Recession began in December 2007 and ended in June 2009, which makes it the longest recession since World War II. Beyond its duration, the Great Recession was notably severe in several respects. . . . Home prices fell approximately 30 percent, on average, from their mid-2006 peak to mid-2009, while the S&P 500 index fell 57 percent from its October 2007 peak to its trough in March 2009." R. Rich, The Great Recession, available at https://www.federalreservehistory.org/essays/great_recession_of_200709

A primary federal response to the foreclosure crisis was HAMP, which was established in 2009 by the United States Department of the Treasury and was designed to encourage loan servicers to modify loans for qualified borrowers. See U.S. Dept. of the Treasury, Making Home Affordable, (last updated January 30, 2017), available at https://www.treasury.gov/initiatives/financial-stability/ TARP-Programs/housing/mha/Pages/hamp.aspx (last visited November 18, 2019); see also *Spaulding* v. *Wells Fargo Bank, N.A.*, 714 F.3d 769, 772 (4th Cir. 2013); *U.S. Bank National Assn. v. Eichten*, 184 Conn. App. 727, 733, 196 A.3d 328 (2018). "HAMP was a national home mortgage modification program aimed at helping [at risk] homeowners who were in default or at imminent risk of default by reducing monthly payments to sustainable levels through the restructuring of their mortgages without discharging any of the underlying debt. . . . It was designed to create a uniform loan modification process governed by federal standards that could be used by any loan servicer that chose to participate." (Citation omitted.) *U.S. Bank National Assn.* v. *Eichten*, supra, 733. Because many servicing agreements between loan servicers and investors in residential mortgage backed securities predated the creation of HAMP, servicers that agreed to participate in the program were required to use reasonable efforts to get investors to waive any restrictions on HAMP loan modifications that existed in the agreements. See United States Dept. of the Treasury, HAMP Supplemental Directive 09-01: Introduction of the Home Affordable Modification Program (April 6, 2009) p. 1 (HAMP Supplemental Directive 09-01), available

<hr>

(last visited November 18, 2019). Foreclosure actions soared during this time period. See generally *Equity One, Inc.* v. *Shivers*, 310 Conn. 119, 145 n.7, 74 A.3d 1225 (2013) (*McDonald, J.*, dissenting) (noting mortgage foreclosure crisis during this period). Nationwide, between 2007 and 2011, foreclosures were initiated on 11 million properties. See A. Sarapinian, "Fighting Foreclosure: Using Contract Law To Enforce the Home Affordable Modification Program (HAMP)," 64 Hastings L.J. 905, 906–907 (2013).

Cenatiempo *v.* Bank of America, N.A.

at https://www.hmpadmin.com/portal/programs/docs/ hamp_servicer/sd0901.pdf (last visited November 18, 2019). The defendant, through a servicer participation agreement,[9] voluntarily elected to participate in HAMP. It thereby became contractually obligated to review and process HAMP applications according to a uniform process. See id., pp. 12, 13–14.

The HAMP application process consists of several components. Relevant to the present case, a borrower first completes a HAMP application to which the borrower must append certain financial documents, such as income verification. Id., pp. 7–8, 13. Financial information must be obtained from the borrower less than ninety days from the date of the eligibility determination. Id., p. 5. HAMP provides specific timetables for each stage of the application process, which helps to ensure that an application is not denied simply because the financial information is no longer current. For example, the servicer must acknowledge receipt of a completed application within ten business days and must notify the borrower of its eligibility determination within thirty calendar days. See United States Dept. of the Treasury, HAMP Supplemental Directive 09-07: Home Affordable Modification Program—Streamlined Borrower Evaluation Process (October 8, 2009) p. 7 (HAMP Supplemental Directive 09-07), available at https://www.hmpadmin.com/portal/programs/docs/ hamp_servicer/sd0907.pdf (last visited November 18, 2019). The content of such notices are prescribed by HAMP. See Dept. of the Treasury, HAMP Supplemental Directive 09-08: Home Affordable Modification Pro-

---

[9] "Mortgage lenders approved by [the Federal National Mortgage Association, known as] Fannie Mae must participate in HAMP. . . . Lenders servicing mortgages not owned or guaranteed by Fannie Mae or [the Federal Home Loan Mortgage Corporation, known as] Freddie Mac may elect to participate in HAMP by executing a [s]ervicer [p]articipation [a]greement with Fannie Mae in its capacity as financial agent for the United States." (Citations omitted; footnote omitted.) *Markle* v. *HSBC Mortgage Corp. (USA)*, 844 F. Supp. 2d 172, 176–77 (D. Mass. 2011).

gram—Borrower Notices (November 3, 2009) pp. 2–4 (HAMP Supplemental Directive 09-08), available at https://www.hmpadmin.com/portal/programs/docs/ hamp_servicer/sd0908.pdf (last visited November 18, 2019).

As part of its eligibility determination, the servicer must conduct a net present value test, which is a "formula that determines whether it would be more profitable for servicers and the loan's investors to approve a modification or to foreclose on the property." A. Sarapinian, "Fighting Foreclosure: Using Contract Law To Enforce the Home Affordable Modification Program (HAMP)," 64 Hastings L.J. 905, 918 (2013); see HAMP Supplemental Directive 09-01, supra, pp. 4–5 (describing test). If the test result favors modification, "the servicer MUST offer the modification," provided all other requirements are met. HAMP Supplemental Directive 09-01, supra, p. 4. If the borrower meets those requirements, they are offered a trial period plan. Id., pp. 14–15. Borrowers who satisfy all of the requirements for the trial period, which is typically three months, must be offered a permanent modification. Id., pp. 17–18.

It quickly became apparent that servicers were not executing HAMP modification reviews with the "high standard of care" required by the program. See HAMP Supplemental Directive 09-08, supra, p. 1. Common problems included loss of borrower paperwork, failure to follow program standards, and unnecessary delays that harmed borrowers while financially benefiting servicers. See A. Sarapinian, supra, 64 Hastings L.J. 914. Consequently, the Office of the Comptroller of the Currency, an independent bureau of the United States Department of the Treasury, examined the mortgage foreclosure processes of numerous servicers, including the defendant. An examination of the defendant's mortgage foreclosure processes found, among other deficiencies, that the defendant "failed to devote sufficient

Cenatiempo *v.* Bank of America, N.A.

financial, staffing and managerial resources to ensure proper administration of its foreclosure processes'' and "failed to devote to its foreclosure processes adequate oversight, internal controls, policies, and procedures, compliance risk management, internal audit, [third-party] management, and training . . . .''[10] *In re Bank of America*, *N.A.*, *Charlotte*, *NC*, supra, 2011 WL 6941540, *2. As a result of the Comptroller's investigation, in April, 2011, the defendant consented to an order that obligated it to remediate what the Comptroller had termed "unsafe or unsound" foreclosure practices.[11] Id., *1. The consent order required the defendant to implement procedures to ensure compliance with the timelines in HAMP, and the defendant reaffirmed its obligation to comply with HAMP. Id., *3.

Approximately one year later, in April, 2012, in a national mortgage settlement, the defendant and several other mortgage servicers entered into a consent judgment with the United States and the attorneys general of forty-nine states and the District of Columbia related to complaints alleging various foreclosure abuses. See *United States* v. *Bank of America Corp.*, supra, United States District Court, Docket No. 1:12-cv-00361 (RMC); see also P. Lehman, "Executive Summary of Multistate/Federal Settlement of Foreclosure Misconduct Claims,'' available at http://www.nationalmortgagesettlement.com/files/ NMS_Executive_Summary-7-23-2012.pdf (last visited November 18, 2019). The national mortgage settlement was brought in part under the "[u]nfair and [d]eceptive [a]cts and [p]ractices laws of the [p]laintiff [s]tates

---

[10] The defendant neither admitted nor denied the Comptroller's findings. See *In re Bank of America*, *N.A. Charlotte*, *NC*, supra, 2011 WL 6941540, *1.

[11] Enforcement actions concerning other servicers were also resolved in April, 2011. See Office of the Comptroller of the Currency, Correcting Foreclosure Practices (last modified January 31, 2017), available at https:// www.occ.gov/topics/consumers-and-communities/consumer-protection/fore-closure-prevention/correcting-foreclosure-practices.html (last visited November 18, 2019).

. . . .'' *United States* v. *Bank of America Corp.*, supra, United States District Court, Docket No. 1:12-cv-00361 (RMC). Relevant to the present case, the national mortgage settlement, as a ''comprehensive reform of mortgage servicing practices,'' was intended to prevent the defendant from continuing to engage in ''improper foreclosure practices'' by imposing numerous controls and standards on the servicing of its loans. P. Lehman, supra, p. 3. For example, the settlement required the defendant to designate a continuing single point of contact for borrowers and provide detailed reasons for the denial of a modification. Id.

Despite these efforts, ''pervasive problems with servicers' performance of loss mitigation activity in connection with the financial crisis'' continued to be of widespread concern. See Mortgage Servicing Rules Under the Real Estate Settlement Procedures Act (Regulation X), 78 Fed. Reg. 10,696, 10,814 (February 14, 2013), codified at 12 C.F.R. § 1024 et seq. (2014). Of particular concern were lost documents, nonresponsive servicers, and an unwillingness to work with borrowers to reach an agreement on loss mitigation options. Id. As a result, the federal Consumer Financial Protection Bureau amended the implementing regulation for RESPA, a consumer protection statute governing the settlement process for residential real estate; see Regulation X, 12 C.F.R. § 1024 et seq. (2014); and created national mortgage servicing standards. See 78 Fed. Reg. 10,696, 10,815 (February 14, 2013). The RESPA amendment adopted much of the timing and staffing requirements of HAMP, the 2011 consent order, and the national mortgage settlement. See id., 10,814, 10,815. Loan servicers that participate in HAMP are required to comply with RESPA. See HAMP Supplemental Directive 09-01, supra, p. 12.

RESPA's Regulation X requires a loan servicer to evaluate a complete loss-mitigation application within

Cenatiempo *v.* Bank of America, N.A.

thirty days of receipt of the application. See 12 C.F.R. § 1024.41 (c) (1) (2014); see also *Urdaneta* v. *Wells Fargo Bank, N.A.*, 734 Fed. Appx. 701, 704–705 (11th Cir. 2018). If an application is not complete, servicers must use reasonable diligence to obtain documents and information to complete the application. See 12 C.F.R. § 1024.41 (b) (1) (2014); see also *Urdaneta* v. *Wells Fargo Bank, N.A.*, supra, 705. Regulation X also requires that loan servicers maintain policies and procedures to ensure, for example, that they can provide borrowers with timely and accurate information in response to requests for information concerning a borrower's mortgage loan; 12 C.F.R. § 1024.38 (a) and (b) (2014); loss mitigation options; 12 C.F.R. § 1024.40 (b) (1) (i) (2014); and the status of a loss mitigation application. 12 C.F.R. § 1024.40 (b) (1) (iii) (2014).

In addition to the federal response to the foreclosure crisis, many states took their own action to address the problem. Connecticut enacted a statutory scheme that established a court administered and supervised foreclosure mediation program. See General Statutes §§ 49-31k through 49-31o. Under the mediation program, neutral mediators assist eligible homeowners facing foreclosure and their lenders or mortgage servicers to achieve a mutually agreeable resolution to a foreclosure action. See General Statutes §§ 49-31k through 49-31o. Mediation shall "address all issues of foreclosure," including, but not limited to, modification of the loan and restructuring of the mortgage debt. General Statutes § 49-31m. Although a servicer is not required to modify the mortgage or change the payment terms if a mortgagor elects to participate in the program; see General Statutes § 49-31o (a); the mortgagee is obligated to engage in some form of loss mitigation review with the mortgagor before foreclosure proceedings can proceed. See General Statutes §§ 49-31*l* and 49-31n.

Cenatiempo *v.* Bank of America, N.A.

III

With this background in mind, we turn to the merits of the plaintiffs' challenge to the trial court's decision to strike their complaint. Our review of a trial court's decision to grant a motion to strike is plenary. See, e.g., *Doe* v. *Hartford Roman Catholic Diocesan Corp.*, 317 Conn. 357, 398, 119 A.3d 462 (2015). This is because a "motion to strike challenges the legal sufficiency of a pleading, and, consequently, requires no factual findings by the trial court. . . . We take the facts to be those alleged in the complaint that has been stricken and we construe the complaint in the manner most favorable to sustaining its legal sufficiency. . . . Thus, [i]f facts provable in the complaint would support a cause of action, the motion to strike must be denied." (Citations omitted; internal quotation marks omitted.) *Suffield Development Associates Ltd. Partnership* v. *National Loan Investors, L.P.*, 260 Conn. 766, 771–72, 802 A.2d 44 (2002).

A

CUTPA

We begin with the plaintiffs' claim that the defendant's alleged misconduct during the course of the loan modification negotiations violated CUTPA. The basic contours of a CUTPA claim are well settled. "CUTPA is, on its face, a remedial statute that broadly prohibits unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . . To give effect to its provisions, [General Statutes] § 42-110g (a) of [CUTPA] establishes a private cause of action, available to [a]ny person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by [General Statutes §] 42-110b . . . ." (Internal quotation marks omitted.) *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 317 Conn. 602, 623, 119 A.3d 1139 (2015). When interpreting

Cenatiempo *v.* Bank of America, N.A.

CUTPA, § 42-110b (b) directs us to consider the interpretations given by the Federal Trade Commission and the federal courts to the Federal Trade Commission Act, 15 U.S.C. § 45 (a) (1), "as from time to time amended."

To successfully state a claim for a CUTPA violation, the plaintiffs must allege that the defendant's acts occurred in the conduct of trade or commerce.[12] See *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, 287 Conn. 208, 217, 947 A.2d 320 (2008). On the record before us, this requirement undoubtedly has been met. It is well settled that CUTPA applies to banks and banking activities. See, e.g., *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, 230 Conn. 486, 521, 646 A.2d 1289 (1994); *Smithfield Associates, LLC* v. *Tolland Bank*, 86 Conn. App. 14, 27, 860 A.2d 738 (2004), cert. denied, 273 Conn. 901, 867 A.2d 839 (2005). Federal courts have specifically held that a bank's "lending and loan modification activities involve the 'conduct of any trade or commerce.' " *Compton* v. *Countrywide Financial Corp.*, 761 F.3d 1046, 1056 (9th Cir. 2014); see *Tanasi* v. *CitiMortgage, Inc.*, 257 F. Supp. 3d 232, 275 (D. Conn. 2017) ("Connecticut courts have held that CUTPA applies to unfair or deceptive conduct by mortgage companies and other holders of mortgage notes" [internal quotation marks omitted]).[13]

---

[12] " 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-110a (4). The parties do not dispute that the plaintiffs, as loan borrowers, are consumers within the meaning of CUTPA. See, e.g., *Compton* v. *Countrywide Financial Corp.*, 761 F.3d 1046, 1053 (9th Cir. 2014) (loan borrowers are consumers within meaning of Hawaii's consumer protection statute).

[13] The defendant contends that the plaintiffs' CUTPA claim relies on settlement negotiations and that such interactions do not fall within CUTPA's trade or commerce requirement. The defendant provides no relevant authority to support this proposition, and it appears to be directly in conflict with the authority previously cited, as well as authority discussed later in this opinion.

The defendant also appears to make a more sweeping argument that "settlement negotiations" cannot provide the basis for a CUTPA claim because Connecticut law generally does not permit evidence of such negotia-

Cenatiempo *v.* Bank of America, N.A.

The plaintiffs also must establish that the alleged acts or practices are unfair or deceptive. "[W]e have adopted [certain] criteria set out in the cigarette rule by the [F]ederal [T]rade [C]ommission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some [common-law], statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three.[14] . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Footnote added; internal quotation marks omitted.) *Ulbrich* v. *Groth*, 310 Conn. 375, 409, 78 A.3d 76 (2013).

We are mindful that our legislature "deliberately chose not to define the scope of unfair or deceptive

tions to be admitted at trial. See, e.g., *Tomasso Bros.*, *Inc.* v. *October Twenty-Four*, *Inc.*, 221 Conn. 194, 198, 602 A.2d 1011 (1992) ("[t]he general rule that evidence of settlement negotiations is not admissible at trial is based upon the public policy of promoting the settlement of disputes" [internal quotation marks omitted]). If the defendant were right, this argument would preclude any theory of liability, not simply under CUTPA, and would permit the defendant to engage in conduct manifestly in conflict with its obligations under federal and state law. We need not concern ourselves with this outcome, however, because there is no authority that supports construing this evidentiary rule regarding settlement negotiations to apply to the plaintiffs' allegations. The plaintiffs plainly are not relying on the substantive terms of any modification offer made or any concessions made by the defendant to resolve the default issue. Rather, they are relying on the defendant's lack of compliance with procedural requirements.

[14] The trial court did not specify which prong or prongs of the cigarette rule served as the basis for its decision. As such, we evaluate each prong.

Cenatiempo *v.* Bank of America, N.A.

acts proscribed by CUTPA so that courts might develop a body of law responsive to the marketplace practices that actually generate such complaints. . . . Predictably, [therefore] CUTPA has come to embrace a much broader range of business conduct than does the [common-law] tort action. . . . Moreover, [b]ecause CUTPA is a self-avowed remedial measure . . . § 42-110b (d), it is construed liberally in an effort to effectuate its public policy goals. . . . Indeed, there is no . . . unfair method of competition, or unfair [or] deceptive act or practice that cannot be reached [under CUTPA].'' (Citations omitted; internal quotation marks omitted.) *Associated Investment Co. Ltd. Partnership* v. *Williams Associates IV*, 230 Conn. 148, 157–58, 645 A.2d 505 (1994). Thus, it has been held that a violation of CUTPA does not ''necessarily have to be based on an underlying actionable wrong . . . .'' *Hartford Electric Supply Co.* v. *Allen-Bradley Co.*, 250 Conn. 334, 369, 736 A.2d 824 (1999). Nonetheless, ''[u]nder CUTPA, only intentional, reckless, unethical or unscrupulous conduct can form the basis for a claim.'' *Ulbrich* v. *Groth*, supra, 310 Conn. 410 n.31.

The plaintiffs' CUTPA claim is grounded in the theory that the business of loan servicing is regulated by certain industry standards imposed by statutes, regulations, and court orders that form a comprehensive policy framework. The plaintiffs contend that the defendant made a conscious decision to depart from these standards and deliberately engage in a pattern of conduct intended to prevent homeowners, like the plaintiffs, from receiving HAMP modifications, which in turn drives up borrower debt.[15] Taken as a whole, and viewed in the light most favorable to sustaining the complaint's legal sufficiency, we agree with the plaintiffs' characterization of their complaint and conclude that these alle-

[15] Indeed, the plaintiffs' complaint alleges that ''[t]he foregoing conduct of [the defendant] demonstrates wilful, knowing, calculated, deceitful, and unfair conduct, and reckless indifference to [the plaintiffs'] rights.''

gations describe conduct that was not merely a technical violation of these provisions or negligent or incompetent, but involved a conscious, systematic departure from known, standard business norms. The plaintiffs' allegations describe practices that are certainly within the " 'penumbra of some . . . established concept of unfairness . . . .' " *Artie's Auto Body, Inc.* v. *Hartford Fire Ins. Co.*, supra, 317 Conn. 609 n.9.

1

Turning to the first criterion of the cigarette rule, we must consider whether the alleged practices offend public policy expressed in statutes, the common law, or elsewhere, that establishes a benchmark of fairness. See *Ulbrich* v. *Groth*, supra, 310 Conn. 409. "Connecticut courts have held that . . . federal . . . lending statutes can demonstrate a 'public policy' as required by [CUTPA]." *Tanasi* v. *CitiMortgage, Inc.*, supra, 257 F. Supp. 3d 275; see also *CitiMortgage, Inc.* v. *Rey*, 150 Conn. App. 595, 609, 92 A.3d 278 ("there are reasons well grounded in public policy . . . to find that a mortgagee who enters into a forbearance agreement during foreclosure litigation . . . should not be permitted to pursue the remedy of foreclosure when the borrower has fully complied with its terms"), cert. denied, 314 Conn. 905, 99 A.3d 635 (2014). We agree with the plaintiffs that the defendant's alleged violations of HAMP, RESPA, the 2011 consent order, the national mortgage settlement, and this state's foreclosure mediation statutes offend the public policies embodied in these provisions.

HAMP was "aimed at helping 3 to 4 million [at risk] homeowners—both those who are in default and those who are at imminent risk of default—by reducing monthly payments to sustainable levels."[16] HAMP Sup-

---

[16] We note that, although a borrower does not have a private right of action under HAMP; *Condel* v. *Bank of America, N.A.*, United States District Court, Docket No. 3:12CV212 (HEH) (E.D. Va. July 5, 2012); a plaintiff may predicate a CUTPA claim on violations of statutes or regulations that

Cenatiempo *v.* Bank of America, N.A.

plemental Directive 09-01, supra, p. 1. In support of this policy, RESPA's implementing regulation, Regulation X, establishes obligations for how a loan servicer must handle a borrower's loss mitigation application under HAMP.[17] See 12 U.S.C. § 2601 (2012); 12 C.F.R. § 1024 (2014). Regulation X requires servicers to timely evaluate loss mitigation applications; 12 C.F.R. § 1024.41 (c) (1) (2014); use reasonable diligence to obtain documents if an application is not complete; 12 C.F.R. § 1024.41 (b) (1) (2014); and maintain policies and procedures to ensure that they can provide borrowers with timely and accurate information. See 12 C.F.R. §§ 1024.38 and 1024.40 (b) (1) (i) and (iii) (2014). At least one federal district court has held that allegations of a loan servicer's "confusing and deceptive communications with vulnerable borrowers violated an important public policy" embedded in HAMP and RESPA. *Tanasi* v. *CitiMortgage, Inc.*, supra, 257 F. Supp. 3d 275.

themselves do not allow for private enforcement. See *Eder Bros., Inc.* v. *Wine Merchants of Connecticut, Inc.*, 275 Conn. 363, 381–82, 880 A.2d 138 (2005). Recovery under CUTPA for violations of HAMP is compatible with the objectives of HAMP, which is to help homeowners avoid foreclosure by obtaining a loan modification. See, e.g., *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 579–86 (7th Cir. 2012) (action under Illinois consumer protection act is consistent with HAMP); *Morris* v. *BAC Home Loans Servicing, L.P.*, 775 F. Supp. 2d 255, 261 (D. Mass. 2011) (recovery under Massachusetts consumer protection act is consistent with HAMP). Indeed, "the [s]ervicer [p]articipation [a]greement between servicers and the government provides that participating servicers must covenant to act consistent with state consumer protection laws." *Morris* v. *BAC Home Loans Servicing, L.P.*, supra, 261.

[17] Permitting recovery under CUTPA for violations of RESPA is compatible with RESPA's objectives and enforcement mechanisms. RESPA is a consumer protection statute; 12 U.S.C. § 2601 (2012) (Congressional findings); which, by way of Regulation X, establishes obligations concerning how a loan servicer must handle a borrower's loss mitigation application. See 12 C.F.R. § 1024 et seq. (2014). By providing a private right of action pursuant to 12 U.S.C. § 2605 (f), it is the intent of RESPA that borrowers have the ability to enforce compliance. There is nothing about recovery under CUTPA that actively conflicts with this enforcement scheme.

With respect to the national mortgage settlement, the intent of the new servicing standards it imposed was, in part, to "increase the transparency of the loss mitigation process, impose time lines to respond to borrowers, and restrict the unfair practice of 'dual tracking,' where foreclosure is initiated despite the borrower's engagement in a loss mitigation process." P. Lehman, supra, p. 3. In pursuit of these goals, banks and servicers agreed to adopt numerous controls and standards in the servicing of loans, including maintaining adequate documentation of borrower account information and designating a continuing single point of contact to coordinate document submissions and inform borrowers of the status of their loss mitigation applications. Id. Likewise, through the 2011 consent order, the defendant agreed to substantially similar requirements, including compliance with all applicable federal laws such as HAMP. See *In re Bank of America, N.A., Charlotte, NC*, supra, 2011 WL 6941540, *3. Mortgage practices in contravention of the terms of the national mortgage settlement and the 2011 consent order have been held to offend public policy for purposes of state consumer protection laws. See *Saccameno* v. *Ocwen Loan Servicing, LLC*, 372 F. Supp. 3d 609, 630 (N.D. Ill. 2019) ("standards of conduct imposed by consent decrees and settlement agreements" sufficiently reflect public policy), appeal filed sub nom. *Saccameno* v. *U.S. Bank National Assn.*, United States Court of Appeals, Docket No. 19-1569 (7th Cir. March 29, 2019); id., 630–31 (loan servicer's conduct offended public policy embodied in national mortgage settlement for purposes of Illinois' consumer protection act); *Lowry* v. *Wells Fargo Bank, N.A.*, United States District Court, Docket No. 15-C-4433 (N.D. Ill. September 2, 2016) (mortgage practices in contravention of terms of national mortgage settlement and 2011 consent decree offended public policy); see also *Morris* v. *BAC Home Loans Servicing, L.P.*, 775

Cenatiempo *v.* Bank of America, N.A.

F. Supp. 2d 255, 262 (D. Mass. 2011) (concluding that recovery under state's consumer protection law similar to CUTPA is consistent with HAMP).

This state's foreclosure mediation statutes were similarly designed to help homeowners remain in their homes by avoiding foreclosure. See 51 S. Proc., Pt. 17, 2008 Sess., p. 5061, remarks of Senator Bob Duff ("[Foreclosure mediation] . . . will help our consumers in the state very much. And I think it will also help the banks quite a bit too because . . . no bank likes to foreclose on a loan."); id., p. 5085, remarks of Senator Robert J. Kane ("[t]he mediation process, although not perfect, is very good because it will get people to maybe stay in their homes a bit longer"). Foreclosure mediation was intended to "address all issues of foreclosure," including modification of the loan and restructuring of the mortgage debt. General Statutes § 49-31m. Our statutes governing the foreclosure mediation program are a source of public policy. See, e.g., *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, 185 Conn. App. 340, 359, 197 A.3d 415 (2018) ("our statutes themselves are a source of public policy").

The plaintiffs have alleged conduct by the defendant that is contrary to the policies of HAMP, RESPA, the national mortgage settlement, the 2011 consent order, and this state's foreclosure mediation statutes. They alleged that the defendant failed to timely review completed applications, erroneously issued denials based on failures to provide requested documentation that had previously been supplied, erroneously issued denials based on investor restrictions that did not exist, and conducted flawed evaluations of applications. They also alleged that, throughout the loan modification process, the defendant was often nonresponsive, failing to return the plaintiffs' phone calls or follow up with the plaintiffs as promised. When the plaintiffs did receive a communication from the defendant regarding the status of their

modification applications, it was often evasive or inconsistent, or it was in the form of a denial without explanation. In contravention of the national mortgage settlement's requirement that the plaintiffs must have a single point of contact for their applications, the defendant designated a number of different employees to respond to the plaintiffs' inquiries in seriatim. The plaintiffs further alleged that, contrary to the policies in this state's foreclosure mediation statutes, the defendant charged them attorney's fees despite its failure to comply with its duties under the mediation statutes. These allegations, if proven at trial, are sufficient to establish the defendant's violations of the public policies embodied in the aforementioned sources of legal obligations because the defendant's alleged actions made it much more difficult for the plaintiffs to reduce the amount of their mortgage payments to sustainable levels in order to avoid foreclosure. Accordingly, we conclude that the plaintiffs have alleged violations of public policy sufficient to satisfy the first criterion of the cigarette rule.

2

Turning to the second criterion of the cigarette rule, we must consider whether the defendant's allegedly improper practices are " 'immoral, unethical, oppressive, or unscrupulous . . . .' " *Ulbrich* v. *Groth*, supra, 310 Conn. 409. The plaintiffs allege that the defendant's misrepresentations in violation of HAMP, RESPA, the 2011 consent order, the national mortgage settlement, and this state's foreclosure mediation statutes satisfy this criterion. Specifically, they allege that, by "capitalizing inflated past due interest along with attorney's fees and costs, the defendant ultimately profits from the excessive delay at the cost of the consumer through servicing fees." It is well settled that a "trade practice that is undertaken to maximize the defendant's profit at the expense of the plaintiff's rights comes under the second prong of the cigarette rule." *Votto* v. *American*

Cenatiempo *v.* Bank of America, N.A.

*Car Rental, Inc.*, 273 Conn. 478, 485, 871 A.2d 981 (2005); see *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 357, 805 A.2d 735 (defendant general contractor was held liable for CUTPA violation under second prong of cigarette rule after listing plaintiff subcontractor as successful bidder but failing to honor contract), cert. denied, 262 Conn. 922, 812 A.2d 864 (2002).

We are mindful that "not every technical violation of HAMP" should expose a servicer to liability under a state's consumer protection laws. See *Morris* v. *BAC Home Loans Servicing, L.P.*, supra, 775 F. Supp. 2d 263. Plaintiffs that have sufficiently alleged unfair or deceptive actions based on HAMP violations "have alleged a pattern of misrepresentations, failure to correct detrimental errors, and/or dilatory conduct on the part of the servicer and/or bank . . . ." (Internal quotation marks omitted.) *Ayoub* v. *CitiMortgage, Inc.*, United States District Court, Docket No. 15-cv-13218 (ADB), 2018 WL 1318919, *4 (D. Mass. March 14, 2018); see *Hanrahran* v. *Specialized Loan Servicing, LLC*, 54 F. Supp. 3d 149, 155 (D. Mass. 2014) ("a pattern or course of conduct involving misrepresentations, delay, and evasiveness in evaluating a HAMP application" sufficiently alleges unfair conduct); *Hanrahran* v. *Specialized Loan Servicing, LLC*, supra, 155 (citing cases discussing such pattern or course of conduct). "[T]he relevant conduct is the entirety of [the defendant's] actions, not each action viewed in isolation." (Internal quotation marks omitted.) *Hanrahran* v. *Specialized Loan Servicing, LLC*, supra, 156.

We agree with the plaintiffs that the defendant's alleged violations of HAMP, RESPA, the 2011 consent order, the national mortgage settlement, and this state's foreclosure mediation statutes, if proven at trial, could be found to be immoral, unethical, oppressive, or unscrupulous. As discussed, the plaintiffs alleged that the defendant repeatedly switched their primary point

of contact and they were often unable to get the assigned point of contact on the phone. When the plaintiffs did speak with an individual, that person often made inaccurate statements or could not locate anything the plaintiffs had previously submitted. The defendant also repeatedly required resubmission of documents previously provided. With respect to the defendant's evaluation of the plaintiffs' modification applications, the defendant repeatedly provided ambiguous explanations for denying their modifications or denied modifications on the pretext of an inability to contact the plaintiffs, nonexistent investor restrictions, and an inaccurate net present value calculation based on an inflated property value. The defendant also repeatedly failed to provide the plaintiffs with a response to a complete loss mitigation application within the proscribed time frame, often resulting in applications pending for *hundreds* of days. These allegations go beyond mere negligence and amount to a conscious departure from known, standard business norms.[18] See, e.g., *Ulbrich* v. *Groth*, supra, 310 Conn. 435–37 (jury reasonably could have found bank's failure to inform potential buyers that some items of property did not belong to debtors was "not merely negligent or incompetent, but involved a conscious departure from known, standard business norms and was therefore unscrupulous, 'within at least the penumbra of some . . . statutory, or other established concept of unfairness' "); id., 435 (bank's actions were "the result of a conscious decision not to perform a known obligation").

We note that other courts have concluded that allegations of improper handling of loan modification applica-

---

[18] We are mindful that Regulation X did not come into effect until January 10, 2014. As such, the plaintiffs' reliance on conduct in violation of RESPA must be limited to actions that occurred on or after that effective date. See *Campbell* v. *Nationstar Mortgage*, 611 Fed. Appx. 288, 297 (6th Cir.) (Regulation X's effective date reflects intent not to apply it to conduct occurring prior to that date), cert. denied, U.S. , 136 S. Ct. 272, 193 L. Ed. 2d 137 (2015).

Cenatiempo *v.* Bank of America, N.A.

tions are sufficient to state a claim under state consumer protection laws. See, e.g., *Wigod* v. *Wells Fargo Bank, N.A.*, 673 F.3d 547, 574–75 (7th Cir. 2012) (ineffectual implementation of HAMP was sufficient to state claim under Illinois consumer protection act); *Tanasi* v. *CitiMortgage, Inc.*, supra, 257 F. Supp. 3d 275 (allegations that bank deceptively solicited modification agreements and that bank's communications were confusing and deceptive was sufficient to state CUTPA claim); *Walker* v. *Deutsche Bank National Trust Co.*, United States District Court, Docket No. 3:16-cv-697 (AWT) (D. Conn. March 24, 2017) (allegations that bank repeatedly asked for documents over six year period, bad faith use of mediation program and breached modification agreements was sufficient to state CUTPA claim); *Ayoub* v. *CitiMortgage, Inc.*, supra, 2018 WL 1318919, *5 (allegations of repeated "ambiguous and opaque explanations" for denying loan modification applications was sufficient to state Massachusetts consumer protection act claim); *Kirtz* v. *Wells Fargo Bank, N.A.*, United States District Court, Docket No. 12-10690 (DJC) (D. Mass. November 29, 2012) (allegations that bank's history of requiring borrower to resubmit same documents to support HAMP loan modification coupled with repeatedly changing bank officials in charge of requested modification and closing file on pretext of inability to contact borrower was sufficient to state claim under Massachusetts consumer protection act).

In addition to their allegations that the defendant improperly had handled loan modification applications, the plaintiffs alleged that the defendant had discouraged them from participating in the state's foreclosure mediation program by misrepresenting the program's utility. The defendant allegedly sent the plaintiffs a letter claiming that it is a " 'common misconception' " that a borrower will receive a better resolution in mediation and

encouraging the plaintiffs to work outside of court so as " 'to avoid the inconvenience of holding a hearing.' " The defendant allegedly engaged in a statewide practice of sending similar letters to borrowers in an attempt to reduce the extent of supervision the court could exercise over the defendant's loan modification review process. Viewed in the light most favorable to the plaintiffs, this claim alleges that the defendant used an unscrupulous and deceptive practice to induce the plaintiffs, and other borrowers, into forgoing their right to elect to participate in the state's foreclosure mediation program. See, e.g., *Caldor, Inc.* v. *Heslin,* 215 Conn. 590, 597, 577 A.2d 1009 (1990) ("[A]n act or practice is deceptive if three requirements are met. 'First, there must be a representation, omission, or other practice likely to mislead consumers. Second, the consumers must interpret the message reasonably under the circumstances. Third, the misleading representation, omission, or practice must be material—that is, likely to affect consumer decisions or conduct.' " [Footnote omitted.]), cert. denied, 498 U.S. 1088, 111 S. Ct. 966, 112 L. Ed. 2d 1053 (1991).

With regard to the effect of these violations, the plaintiffs allege that the permanent HAMP loan modification agreement provided to them by the defendant included "tens, if not hundreds, of thousands of [dollars in] new principal consisting of improper and illicit charges such as attorney's fees . . . other default fees that should never have been [in]curred, commencing a second foreclosure action for no reason, and accrued interest . . . far [in] excess of what [the plaintiffs] would pay had [the defendant] timely and properly evaluated their initial loan modification application." These allegations provide additional support for the conclusion that the defendant's conduct was immoral, unethical, oppressive, or unscrupulous. See, e.g., *Votto* v. *American Car Rental, Inc.,* supra, 273 Conn. 485; see also *Monetary*

Cenatiempo *v.* Bank of America, N.A.

*Funding Group, Inc.* v. *Pluchino*, 87 Conn. App. 401, 413, 867 A.2d 841 (2005) (mortgagee's intentional misconduct with respect to transaction in order to obtain excessive fees and costs satisfied second cigarette rule criterion).

The plaintiffs further allege that the defendant's conduct was a result of a widespread policy that prevented borrowers from receiving HAMP modifications. This allegation is based on affidavits from employees of the defendant taken in connection with a motion for class certification in a federal action filed against the defendant. See *Sheely* v. *Bank of America, N.A.*, 36 F. Supp. 3d 1364, 1372 (2014); see also *In re Bank of America Home Affordable Modification Program (HAMP) Contract Litigation*, Docket No. M.D.L. 10-2193 (RWZ), 2013 WL 4759649 (D. Mass. September 4, 2013). Specifically, the plaintiffs alleged that the defendant had a corporate culture of intentional and wrongful conduct. Such conduct included requiring customers to return documents on short notice but waiting months before reviewing such documents, training employees to falsely tell homeowners that it had not received their documents, allowing employees to remove documents from homeowners' files in order to make the accounts appear ineligible for modification, training employees to perform a "blitz" twice a month, during which the defendant would order case managers and underwriters to deny any HAMP applications in which the financial documents were more than sixty days old, and failing to adequately train and staff the departments responsible for processing HAMP modifications. Such an allegation further supports a determination that the defendant's conduct was immoral, unethical, oppressive, or unscrupulous. Cf. *Jacobs* v. *Healey Ford-Subaru, Inc.*, 231 Conn. 707, 729, 652 A.2d 496 (1995) (statutory noncompliance was not unfair, deceptive or oppressive when it was "isolated instance of misinter-

pretation by the defendant of its obligations due to the unique circumstances of this particular case as distinguished from unfair or deceptive acts or practices in the defendant's trade or business''); see *Nickerson-Reti* v. *Bank of America, N.A.*, Docket No. 13-12316 (FDS), 2018 WL 2271013, \*17 (D. Mass. May 17, 2018) (''sworn statements from Bank of America employees made in connection with a different Massachusetts lawsuit'' that employees were instructed to delay action on applications, offer more expensive in-house options, and deny applications in which financial documents were more than thirty or sixty days old constituted sufficient evidence from which fact finder could conclude that bank engaged in unfair and deceptive practices). As such, viewed in the light most favorable to sustaining the complaint's legal sufficiency, we conclude that the plaintiffs have sufficiently alleged immoral, unethical, oppressive, or unscrupulous actions that satisfy the second criterion of the cigarette rule.

3

Finally, we turn to the third criterion, which requires us to consider whether the alleged conduct caused substantial injury to the plaintiffs. See *Ulbrich* v. *Groth*, supra, 310 Conn. 409. In evaluating whether the third criterion is satisfied, we have explained that ''not . . . every consumer injury is legally unfair . . . . To justify a finding of unfairness the injury must satisfy three tests. It must be substantial; it must not be outweighed by any countervailing benefits to consumers or competition that the practice produces; and it must be an injury that consumers themselves could not reasonably have avoided.'' (Internal quotation marks omitted.) *McLaughlin Ford, Inc.* v. *Ford Motor Co.*, 192 Conn. 558, 569–70, 473 A.2d 1185 (1984).

The plaintiffs have sufficiently alleged that they suffered substantial injury from the defendant's conduct. They alleged that the permanent HAMP loan modifica-

Cenatiempo *v.* Bank of America, N.A.

tion agreement "called for a balance that included tens, if not hundreds, of thousands of [dollars in] new principal . . . ." Specifically, the plaintiffs alleged that they incurred an accumulation of interest, default fees, significant arrearages, attorney's fees, and a much higher monthly mortgage payment, lost the opportunity to earn $5000 in borrower incentive payments under HAMP, and suffered emotional distress. Further, the plaintiffs alleged systematic defects with the defendant's loan servicing practices, which had the potential to injure a large number of other consumers. See *Stephens* v. *Capital One, N.A.*, Docket No. 15-cv-9702, 2016 WL 4697986, *6 (N.D. Ill. September 7, 2016) ("[d]efendant's expansive consumer base . . . allows the [c]ourt to reasonably infer that a large consumer base may be at risk for similar conduct that has been alleged to qualify as 'unfair' under the [state's consumer protection act]").

There is also a sufficient basis to infer that the defendant's practices are not outweighed by countervailing benefits to consumers or competitors, as the legal requirements prescribed under HAMP, RESPA and the other obligations have already been weighed in that balance. The defendant has identified no benefit that inures to the consumer by allowing it to provide untimely, incomplete, and inaccurate information. Insofar as the defendant asserts that requiring servicers to timely and appropriately process HAMP modification applications will deter such entities from engaging in the modification process, that might be the case if we were concluding that minor, infrequent, unintentional delays and/or errors in processing applications provide a basis for a CUTPA claim. We plainly are not.[19] The

[19] As previously discussed, the plaintiffs alleged that the defendant had engaged in numerous, systematic abuses of the mortgage modification process. The defendant not only violated the public policies embodied in HAMP and RESPA but also the 2011 consent order and the national mortgage settlement, to which it was a party. Indeed, the 2011 consent order and the national mortgage settlement were the result of findings that the defendant had not been executing HAMP modification reviews with the "high standard of care" required by the program. See *United States* v. *Bank of America*

Cenatiempo *v.* Bank of America, N.A.

defendant's alleged practices could hardly be characterized as simply a "technical violation" of a statute; *Normand Josef Enterprises, Inc.* v. *Connecticut National Bank*, supra, 230 Conn. 524; an inadvertent violation of a statute; *Gaynor* v. *Union Trust Co.*, 216 Conn. 458, 483, 582 A.2d 190 (1990); or an isolated incident of a good faith mistake. *Jacobs* v. *Healey Ford-Subaru, Inc.*, supra, 231 Conn. 728–29.[20] There continues to be a financial incentive for investors to have their loan servicers modify loans rather than undertake foreclosure in appropriate cases. See, e.g., A. Levitin, "Resolving the Foreclosure Crisis: Modification of Mortgages in Bankruptcy," 2009 Wis. L. Rev. 565, 568 (2009) ("lenders are estimated to lose from 40 to 50 percent of their investment in a foreclosure situation"). Indeed, that is the purpose of HAMP's net present value test. See J. Chiles & M. Mitchell, "HAMP: An Overview of the Program and Recent Litigation Trends," 65 Consumer Fin. L. Q. Rep. 194, 196 (2011) ("[net present value] test is a mathematical formula used to determine whether the mortgage investor would make more money by approving a modification or by allowing the subject property to go into foreclosure"); A. Sarapinian, supra, 64 Hastings L.J. 918 (net present value test "is a formula that determines whether it would be more profitable for servicers and the loan's investors to approve a modification or to foreclose on the property"). Permitting recovery based on allegations that a servicer made continuous and systematic departures from known standards is not outweighed by any benefits to loan servicers in escaping liability for such actions.

*Corp.*, supra, United States District Court, Docket No. 1:12-cv-00361 (RMC); *In re Bank of America, N.A., Charlotte, NC*, supra, 2011 WL 6941540, *2; HAMP Supplemental Directive 09-08, supra, p. 1. We do not have occasion to address whether a servicer would be liable if any of these aggravating factors were not present.

[20] The trial court's concern that it is not "appropriate or productive to adopt a requirement of 'just right' pacing of foreclosure mediation and negotiations, where too fast or too slow (including inefficiency and perhaps some level of incompetence) might result in . . . CUTPA based liability" is therefore misplaced.

333 Conn. 769 NOVEMBER, 2019 805

Cenatiempo *v.* Bank of America, N.A.

Undoubtedly, the plaintiffs could have avoided their injuries had they not defaulted on their mortgage. But that is the case in every situation involving a modification process for a financially troubled borrower. Borrowers, however, generally do not choose their loan servicer, and, consequently, any injuries sustained as a result of the improper handling of a loan modification process are not ones that consumers could have reasonably avoided. Thus, we conclude that, on balance, the plaintiffs have alleged conduct that caused them substantial injury.

Mindful that CUTPA is a broad remedial statute, and given the degree to which the defendant's alleged conduct, viewed in the light most favorable to sustaining the legal sufficiency of the complaint, violates each cigarette rule criterion, we conclude that the plaintiffs have alleged a CUTPA violation sufficient to survive a motion to strike. Accordingly, we reverse the judgment of the trial court insofar as that court struck the CUTPA count of the plaintiffs' complaint.

B

Negligence

We now turn to the plaintiffs' claim that the defendant's alleged misconduct during the course of the loan modification negotiations was negligent. Although it is not clear from the complaint, the plaintiffs, on appeal, contend that they have alleged two theories of negligence: (1) they were owed a common-law duty of care arising out of HAMP, RESPA, the state's foreclosure mediation statutes, the 2011 consent order, and the national mortgage settlement; and (2) the requirements imposed by RESPA and this state's foreclosure mediation statutes establish a duty of care, the violations of which constitute negligence per se.

We begin with the plaintiffs' common-law theory. "The essential elements of a cause of action in negli-

gence are well established: duty; breach of that duty; causation; and actual injury. . . . Duty is a legal conclusion about relationships between individuals, made after the fact, and [is] imperative to a negligence cause of action. . . . Thus, [t]here can be no actionable negligence . . . unless there exists a cognizable duty of care." (Internal quotation marks omitted.) *Mazurek* v. *Great American Ins. Co.*, 284 Conn. 16, 29, 930 A.2d 682 (2007). A duty of care "may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." *Coburn* v. *Lenox Homes, Inc.*, 186 Conn. 370, 375, 441 A.2d 620 (1982). "[T]he test for the existence of a legal duty [of care] entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular plaintiff in this case." (Internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, 315 Conn. 320, 328–29, 107 A.3d 381 (2015).

The plaintiffs contend that we should recognize a common-law duty requiring a loan servicer to use reasonable care in the review and processing of a mortgagor's loan modification applications. We decline to do so.

We agree with the plaintiffs that, based on the defendant's extensive experience servicing defaulted mortgages, it was foreseeable that, if the defendant failed to timely and efficiently review their loan modification applications, the plaintiffs would suffer financial harm as a result. Foreseeability that harm may result if a duty of care is not exercised does not mean "that one charged

Cenatiempo *v.* Bank of America, N.A.

with negligence must be found actually to have foreseen the probability of harm or that the particular injury which resulted was foreseeable, but the test is, would the ordinary [person] in the defendant's position, knowing what he knew or should have known, anticipate that harm of the general nature of that suffered was likely to result . . . ." (Internal quotation marks omitted.) *Jarmie* v. *Troncale*, 306 Conn. 578, 590, 50 A.3d 802 (2012). A sophisticated loan servicer, like the defendant, should reasonably foresee that an unnecessarily prolonged period of default caused by the negligent handling of loan modification applications would cause a borrower to suffer financial injury, such as attorney's fees and additional interest and default fees. In fact, as we explained in part III A of this opinion, this effect is alleged to have been the defendant's objective.

"[A] simple conclusion that the harm to the plaintiff was foreseeable . . . cannot by itself mandate a determination that a legal duty exists. Many harms are quite literally foreseeable, yet for pragmatic reasons, no recovery is allowed. . . . A further inquiry must be made, for we recognize that duty is not sacrosanct in itself . . . but is only an expression of the sum total of those considerations of policy [that] lead the law to say that the plaintiff is entitled to protection. . . . The final step in the duty inquiry, then, is to make a determination of the fundamental policy of the law, as to whether the defendant's responsibility should extend to such results." (Internal quotation marks omitted.) *Munn* v. *Hotchkiss School*, 326 Conn. 540, 549–50, 165 A.3d 1167 (2017).

"[I]n considering whether public policy suggests the imposition of a duty, we . . . consider the following four factors: (1) the normal expectations of the participants in the activity under review; (2) the public policy of encouraging participation in the activity, while weighing the safety of the participants; (3) the avoid-

ance of increased litigation; and (4) the decisions of other jurisdictions. . . . [This] totality of the circumstances rule . . . is most consistent with the public policy goals of our legal system, as well as the general tenor of our [tort] jurisprudence." (Citation omitted; internal quotation marks omitted.) *Ruiz* v. *Victory Properties, LLC*, supra, 315 Conn. 337. The second and third factors are analytically related and considered together. See *Lawrence* v. *O & G Industries, Inc.*, 319 Conn. 641, 658, 126 A.3d 569 (2015). "[I]n considering these two factors, [we] at times [have] employed a balancing test to determine whether, in the event that a duty of care is recognized by the court, the advantages of encouraging participation in the activity under review outweigh the disadvantages of the potential increase in litigation." *Bloomfield Health Care Center of Connecticut, LLC* v. *Doyon*, supra, 185 Conn. App. 371. "We acknowledge that as in any case that involves the question of whether our public policy, as a matter of common law, should recognize a new cause of action, the ultimate decision comes down to a matter of judgment in balancing the competing interests involved." *Mendillo* v. *Board of Education*, 246 Conn. 456, 495, 717 A.2d 1177 (1998), overruled in part on other grounds by *Campos* v. *Coleman*, 319 Conn. 36, 37–38, 123 A.3d 854 (2015).

As a general matter, the law does not impose a duty on lenders to use reasonable care in its commercial transactions with borrowers because the relationship between lenders and borrowers is contractual and loan transactions are conducted at arm's length. See *Saint Bernard School of Montville, Inc.* v. *Bank of America*, 312 Conn. 811, 836, 95 A.3d 1063 (2014) ("[g]enerally there exists no fiduciary relationship merely by virtue of a borrower-lender relationship between a bank and its customer" [internal quotation marks omitted]); *Southbridge Associates, LLC* v. *Garofalo*, 53 Conn. App.

333 Conn. 769 NOVEMBER, 2019 809

Cenatiempo *v.* Bank of America, N.A.

11, 19, 728 A.2d 1114 (''[a] lender has the right to further its own interest in a mortgage transaction and is not under a duty to represent the customer's interest''), cert. denied, 249 Conn. 919, 733 A.2d 229 (1999). The question, therefore, is whether to treat a relationship between an investor's loan servicer and a mortgagor differently in the context of the former's review and processing of a loan modification application.

With respect to the normal expectations of the participants in the activity, the plaintiffs argue that they ''reasonably expected that the defendant, a large national institution with dozens of retail banking branches in their own state, would review their loan workout applications in a timely and accurate manner'' and that the defendant ''should reasonably expect that it will need to follow the rules to which it is subject.'' We agree. This factor, however, is just one in the totality of the circumstances assessment.

As to the second and third factors, we agree with the defendant that imposing a duty of care could inhibit participation in the loan modification process and increase litigation. Recognizing a duty of care and, consequently, a negligence cause of action, would have far-reaching consequences that extend beyond anything implicated under CUTPA.[21] In part III A of this opinion, we concluded that the plaintiffs' allegations, if credited, would allow a jury to conclude that the defendant engaged in numerous, systematic abuses that prevented homeowners from receiving HAMP modifications and, as such, were sufficiently unfair and deceptive to state a claim under CUTPA. If the court were to recognize a common-law duty of care, however, it could result in

---

[21] As we discuss in greater detail in part III A 1 of this opinion, the policy considerations implicated in our CUTPA analysis are different from those implicated in the negligence context. Loan servicer misconduct is more appropriately addressed by a statute targeted at business practices, like CUTPA, rather than a generic common-law principle, like negligence.

loan servicer liability for isolated violations or far less consequential violations of the loan modification process, which would hinder servicer participation in the modification process. Indeed, several courts have explained that recognizing a private right of action under HAMP for mere negligence ''would likely chill servicer participation based on fear of exposure to litigation.'' *Miller* v. *Chase Home Finance, LLC*, 677 F.3d 1113, 1116 (11th Cir. 2012); see *Zoher* v. *Chase Home Financing*, Docket No. 10-14135-CIV, 2010 WL 4064708, *4 (S.D. Fla. October 15, 2010) (no implied private right of action because servicers would be discouraged ''from participating in the program because they would be exposed to significant litigation expenses''). ''[B]y creating a compliance vehicle through [the Federal Home Loan Mortgage Corporation, known as] Freddie Mac and by including reporting requirements, the HAMP [g]uidelines already designated a scheme to correct . . . any mortgagee wrongdoing.'' (Internal quotation marks omitted.) *Zoher* v. *Chase Home Financing*, supra, *4.

With respect to the national mortgage settlement and the 2011 consent order, although the defendant agreed to comply with the more stringent servicing standards when it entered into these settlements, they do not create a special relationship between lenders and borrowers that would give rise to a legal duty. See *Miller* v. *Bank of New York Mellon*, 379 P.3d 342, 348 (Colo. App. 2016) (''courts across the country have held that the [national mortgage settlement] did not create a special relationship between lenders and borrowers''); id. (citing cases holding that no such relationship was created). Furthermore, as incidental third-party beneficiaries of the national mortgage settlement and the 2011 consent order, individual borrowers do not have standing to sue to protect the benefits that they confer. See *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U.S. 723,

Cenatiempo *v.* Bank of America, N.A.

750, 95 S. Ct. 1917, 44 L. Ed. 2d 539 (1975) (consent
decree is "not enforceable directly or in collateral pro-
ceedings by those who are not parties to it even though
they were intended to be benefited by it"); *Securities &
Exchange Commission* v. *Prudential Securities, Inc.*,
136 F.3d 153, 159 (D.C. Cir. 1998) ("[w]hen a consent
decree or contract explicitly provides that a third party
is not to have enforcement rights, that third party is
considered an incidental beneficiary even if the parties
to the decree or contract intended to confer a direct
benefit upon that party"). Indeed, courts have rejected
claims by individual borrowers under the national mort-
gage settlement. See, e.g., *Ghaffari* v. *Wells Fargo Bank,
N.A.*, 6 F. Supp. 3d 24, 30 (D.D.C. 2013) ("claims by
individual borrowers . . . are excluded from the
[national mortgage settlement]"); *Miller* v. *Bank of New
York Mellon*, supra, 347 ("numerous federal and state
courts . . . have unanimously rejected homeowner
claims against their lenders premised on the [national
mortgage settlement], holding that homeowners lack
standing to enforce it"). If we were to find that the
national mortgage settlement or the 2011 consent order
gives rise to a duty owed to incidental beneficiaries, it
would discourage parties from resolving issues in this
manner and run afoul of our strong public policy in
favor of the voluntary settlement of civil suits. See *All-
state Ins. Co.* v. *Mottolese*, 261 Conn. 521, 531, 803 A.2d
311 (2002).

Moreover, loan servicers are already exposed to lia-
bility for violations of RESPA's implementing regula-
tion, Regulation X; see 12 U.S.C. § 2605 (f) (2012); 12
C.F.R. § 1024.41 (a) (2014); and civil penalties for viola-
tions of the national mortgage settlement; see P. Leh-
man, supra, p. 3; and 2011 consent order; see *In re
Bank of America, N.A., Charlotte, NC*, supra, 2011 WL
6941540, *16. This state's foreclosure mediation statutes
similarly allow for the use of sanctions to deter and

punish inappropriate conduct during the course of mediation. See General Statutes § 49-31n (c) (2). As such, it is not likely that imposing a new duty on loan servicers will further incentivize them to carry out their review of loan modification applications with any more due care, but it will increase litigation. See, e.g., *Lawrence* v. *O & G Industries, Inc.*, supra, 319 Conn. 659 ("[W]e observe that expanding the defendants' liability in this industrial accident context to include the purely economic damages suffered by other workers on site appears likely to increase the pool of potential claimants greatly. At the same time, the recognition of such a duty fails to provide a corresponding increase in safety, given that companies like the defendants are subject to extensive state and federal regulation, and already may be held civilly liable to a wide variety of parties who may suffer personal injury or property damage as a result of their negligence in the industrial or construction context." [Footnote omitted.]). Thus, we agree with the defendant that, under the second and third factors, imposing a duty on a loan servicer would frustrate the loan modification process and lead to increased litigation.

Finally, the plaintiffs concede that the fourth factor, the decisions of other jurisdictions, does not cut in either party's favor. See *Blanco* v. *Bank of America, N.A.*, Superior Court, judicial district of Hartford, Docket No. CV-15-6060162-S (April 20, 2016) ("[a]lthough this court's own independent research reveals that some jurisdictions have imposed a duty of care on entities in the defendant's position, it is apparent that no clear consensus exists"). We note, however, that numerous courts have concluded that neither HAMP nor the relationship between a borrower and servicer/lender imposes any duty of care owed by lending banks and servicers to borrowers. See, e.g., *MacKenzie* v. *Flagstar Bank, FSB*, 738 F.3d 486, 495–96

Cenatiempo *v.* Bank of America, N.A.

(1st Cir. 2013) (relationship between borrower and lender does not give rise to duty of care, and failure to abide by servicer participation agreement or HAMP when processing loan modifications does not give rise to negligence claim); *Legore* v. *OneWest Bank, FSB*, 898 F. Supp. 2d 912, 918 (D. Md. 2012) (plaintiff could not rely on alleged violation of HAMP guidelines as sole basis for negligence claim because Congress did not intend to create private right of action); *Thomas* v. *JPMorgan Chase & Co.*, 811 F. Supp. 2d 781, 800 (S.D.N.Y. 2011) (servicer participation agreement and HAMP did not impose duty on financial institutions with respect to borrowers, and banks do not owe duty of care to borrowers); *Brown* v. *Bank of America Corp.*, United States District Court, Docket No. 10-11085 (D. Mass. March 31, 2011) (HAMP guidelines do not create duty of care); *U.S. Bank, N.A.* v. *Phillips*, 318 Ga. App. 819, 826, 734 S.E.2d 799 (2012) (''[t]he provisions of HAMP do not plainly impose a legal duty intended to benefit homeowners, so as to authorize a private negligence cause of action''); *Santos* v. *U.S. Bank National Assn.*, 89 Mass. App. 687, 699, 54 N.E.3d 548 (''[i]t is now [well established] that, as a matter of law, HAMP does not create a duty of care owed by mortgagees to mortgagors''), review denied, 476 Mass. 1103, 63 N.E.3d 387 (2016).

As we have observed, ''[c]ourts operating in the quintessential common-law context—that is, when they are asked to recognize a new common-law cause of action—function best, and command the most respect, when their decisions can be defended on grounds of reason and principle.'' *Mendillo* v. *Board of Education*, supra, 246 Conn. 486. Thus, we ''should demand a very strong showing of policy reasons before doing so.'' Id., 487. In our view, on balance, that showing does not exist here. Thus, because we conclude that the defendant did not owe a common-law duty of care to the plaintiffs,

the trial court properly struck the plaintiffs' common-law negligence count.[22]

The plaintiffs contend, however, that their negligence count also may be construed to extend to a theory of negligence per se. The defendant contends that this claim is not properly before us. It points out that the plaintiffs did not allege negligence per se in their complaint and did not allege the violation of any specific statute by the defendant that would support a negligence per se claim. The plaintiffs also did not raise the issue of negligence per se in their motion to reargue, seek an articulation from the trial court on this purported claim, or seek to plead it in a revised complaint.

In response, the plaintiffs contend that they adequately pleaded negligence per se in paragraph 174 of their complaint, wherein they alleged that the defendant "breached a duty imposed by federal regulations and state statutes," and in paragraph 177 of their complaint, wherein they alleged that "such breach caused their injury." The plaintiffs also contend that they defended their negligence per se claim in their opposition to the defendant's motion to strike.

To state a claim of negligence per se, the plaintiffs must satisfy a two-pronged test: (1) they are within the class of persons intended to be protected by the statute; and (2) their injury is the type of harm that the statute was intended to prevent. See, e.g., *Gore* v. *People's Savings Bank*, 235 Conn. 360, 375–76, 665 A.2d 1341 (1995). "The doctrine of negligence per se serves to superimpose a legislatively prescribed standard of care on the general standard of care." *Staudinger* v. *Barrett*, 208 Conn. 94, 101, 544 A.2d 164 (1988).

---

[22] We note that the plaintiffs concede in their brief that, if we determine an increase in litigation is likely and decline to find a common-law duty of care, "the solution would be to strike the common-law aspects of the negligence claim . . . ."

Cenatiempo *v.* Bank of America, N.A.

Nowhere in the complaint do the plaintiffs specifically allege negligence per se. Nor do they identify particular legal provisions that the defendant violated. Even in their opposition to the defendant's motion to strike, on which the plaintiffs rely, they did not identify which statutory provisions established the standard of care that the defendant violated.[23] The plaintiffs were required to plead their claim of negligence per se with greater specificity. See, e.g., *White* v. *Mazda Motor of America, Inc.*, 313 Conn. 610, 631, 99 A.3d 1079 (2014) ("an issue must be 'distinctly raised' before the trial court, not just 'briefly suggested' "). As the plaintiffs acknowledge in their brief, the violation of a statute may constitute negligence per se, or create a presumption of negligence, or make out a prima facie case of negligence, or constitute evidence of negligence. See, e.g., *Ward* v. *Greene*, 267 Conn. 539, 548, 839 A.2d 1259 (2004); see also *Vermont Mutual Ins. Co.* v. *Fern*, 165 Conn. App. 665, 672 n.7, 140 A.3d 278 (2016). The plaintiffs' simple assertion in their opposition to the defendant's motion to strike that the defendant violated RESPA and this state's foreclosure mediation statutes was not sufficient to put the defendant and the trial court on notice that they were advancing a theory of negligence per se. This lack of notice is reflected in the trial court's failure to address negligence per se in its decision granting the motion to strike. The plaintiffs could have but failed to seek an articulation and made no mention of negligence per se in their motion to reargue. We conclude that the plaintiffs did not raise this claim distinctly before the trial court. "The requirement that [a] claim be raised distinctly [before the trial court] means that it must be so stated as to bring to

---

[23] Similarly, in their brief before this court, the plaintiffs broadly argue that the defendant "routinely flouted the statutory objectives of the mediation program" and "did not comply with [Regulation X's] requirements to provide accurate information about loss mitigation options, exercise reasonable diligence in reviewing the [plaintiffs'] loss mitigation applications, or comply with the appeal requirements of the regulation."

Cenatiempo *v.* Bank of America, N.A.

the attention of the court the *precise* matter on which its decision is being asked.'' (Emphasis in original; internal quotation marks omitted.) *Remillard* v. *Remillard*, 297 Conn. 345, 351, 999 A.2d 713 (2010). Accordingly, it would not be appropriate for this court to consider this claim as a basis to reverse the trial court's decision granting the motion to strike the negligence count.

The judgment is reversed with respect to the claim alleging violations of CUTPA and the case is remanded with direction to deny the defendant's motion to strike that claim and for further proceedings according to law; the judgment is affirmed in all other respects.

In this opinion the other justices concurred.